UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CHU DE QUEBEC–UNIVERSITE LAVAL | § § § | |
| v. | § § | CIVIL NO. 4:21-CV-182-SDJ |
| DREAMSCAPE DEVELOPMENT GROUP HOLDINGS, INC., ET AL. | § § § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff CHU de Quebec–Universite Laval's Motion for Summary Judgment, (Dkt. #86), and the parties' subsequent briefing on the motion, (Dkt. #95, #104, #110, #190, #192). After full consideration, the Court will grant the motion in part and deny the motion in part.

## I. BACKGROUND

CHU de Quebec–Universite Laval ("CHU") is the largest university hospital network in the Canadian province of Quebec. (Dkt. #45 ¶ 1). At the start of the COVID-19 pandemic, the government of Quebec tasked CHU with purchasing face masks for use in the Quebec healthcare system. (Dkt. #45 ¶ 14). Consistent with the government's instructions, CHU collaborated with the Quebec Government Acquisitions Center, then operating under the name SigmaSante, to source and arrange for purchase of the masks. (Dkt. #86 at 9).

### A. CHU Enlists R Negotiations to Purchase Masks on Its Behalf.

In early April 2020, SigmaSante came into contact with a New York company called R Negotiations, through one of its representatives, Brian Podolak. (Dkt. #86 at 9); (Dkt. #86-2 at 2–3). Podolak indicated that R Negotiations could assist in

sourcing masks and would do so upon receiving a purchase order and placement of the purchase money into escrow. (Dkt. #86 at 9–10). The purchase money would be held by Gregory Kuczinski, an attorney working for R Negotiations as an escrow agent. (Dkt. #86 at 9–10).

Shortly thereafter, CHU issued three purchase orders to R Negotiations, each for one million 3M model 1860 N95 masks (for a total of three million masks), and each in the amount of $6 million (for a total of $18 million). *See* (Dkt. #86-2 at 3, 12–17). The same day, CHU transferred $18 million to Kuczinski's escrow account. (Dkt. #86 at 10). Kuczinski received the money the next business day. (Dkt. #86-2 at 3, 10).

## B. R Negotiations Purchases Masks From DDGI.

Around the same time, R Negotiations encountered Darrel Fritz. (Dkt. #86-2 at 4). Fritz purported to act on behalf of a company called Dreamscape Development Group, Inc. ("DDGI") that sold personal protective equipment, including face masks.[1] (Dkt. #86-2 at 4). Acting on CHU's behalf, Kuczinski and Robert Werner, R Negotiations' president, entered into discussions with Fritz via telephone for the purchase of the masks. (Dkt. #86 at 10); (Dkt. #86-2 at 4). During those discussions, neither Kuczinski nor Werner disclosed CHU's identity, but they did inform Fritz that they were acting on behalf of an undisclosed end buyer located in Quebec, affiliated with the Quebec government, and that delivery was to be made at a location in Quebec. (Dkt. #86-2 at 4–5).

---

[1] Fritz was DDGI's president, CEO, and primary shareholder. (Dkt. #86-4 at 14).

2

The parties soon reached an oral agreement: DDGI would supply three million masks at $3.50 per unit, for a total of $10.5 million. Kuczinski would transfer a deposit of $5.25 million (50% of the purchase price) to DDGI's account at Morgan Stanley; the remainder would be paid upon delivery of the masks.[2] (Dkt. #86 at 10–11); (Dkt. #86-2 at 4).

Following the parties' oral discussions, R Negotiations issued a purchase order to DDGI with the agreed-upon terms. *See* (Dkt. #86-2 at 23). The next day, DDGI sent back an invoice, largely matching the terms of the purchase order. *See* (Dkt. #86-2 at 25). The invoice did, however, include one term missing from the purchase order— an estimated delivery "timeframe" of "5–7 days . . . after payment receipt confirmation." *Compare* (Dkt. #86-2 at 25), *with* (Dkt. #86-2 at 23) (purchase order listing "Ship date" as "TBD"). Immediately after receiving the invoice, Kuczinski transferred the $5.25 million deposit to DDGI's Morgan Stanley account. (Dkt. #86-2 at 5, 19); (Dkt. #86-11 at 2).

A day later, on April 16, 2020, Kuczinski emailed Fritz a letter (the "April 16 Letter") purporting to confirm the parties' agreement. That letter reads in full:

> Dreamscape Development Group, Inc.,
> 7009 Tilbury Ct.
> McKinney TX 75071
>
> RE: Escrow payment of $5,250,000

---

[2] The parties dispute two facts related to their initial oral discussions. First, according to CHU, "Fritz indicated that DDGI could deliver the masks within 7 days of receiving an order." (Dkt. #86 at 10). Defendants deny that Fritz ever made such a promise. *See* (Dkt. #95 at 7). Second, according to CHU, the parties agreed that the deposit money "would be held in escrow by DDGI." (Dkt. #86 at 10). Defendants deny that they agreed to hold the money in escrow. *See* (Dkt. #95 at 7).

Dear Mr. Fritz:

As a follow up to our conversation, please accept this letter as confirmation of our agreement with respect to the above referenced escrowed funds.

The above referenced escrow was transferred to your Escrow account with Morgan Stanley on April 15, 2020, from my Attorney Escrow Acount, as Escrow Agent. This transfer represented the requisite deposit for the production of 3,000,000.00 3M N95 masks, model 1860, on behalf of the end buyer. As discussed with you, our client, the end buyer in this transaction, is not only in dire need of these masks, but due to previous unsuccessful attempts to obtain the same, has placed a time limit on the production of these masks. Accordingly, if you are unable to produce the entire or at least a partial order of the masks within two weeks of today, then the client requests the full return of the above referenced escrow. You have agreed to these conditions. Accordingly, I have entered into an escrow agreement with the end buyer outlining this these [sic] conditions.

Please indicate your acceptance of these conditions by signing below where indicated.

Thank you for your anticipated cooperation.

Very truly yours,
[/s/ Gregory Kuczinski]
Gregory Kuczinski, Esq.

(Dkt. #86-2 at 27). Fritz countersigned the letter, per its instruction. *See* (Dkt. #86-2 at 27) ("AGREED and ACCEPTED: BY [/s/ Darrel Fritz]").

A few features of the April 16 Letter are worth noting. First, the letter makes clear that Kuczinski and R Negotiations were acting on behalf of an unidentified "end buyer." (Dkt. #86-2 at 27). Second, the letter describes the $5.25 million deposit as an "escrow" payment to be held in DDGI's "escrow" account with Morgan Stanley. (Dkt. #86-2 at 27). Third, the letter conveys a sense of urgency. Because the end buyer was in "dire need of these masks," it placed a two-week "time limit" on their

4

production. (Dkt. #86-2 at 27). If DDGI failed to produce "the entire or at least a partial order of the masks" by the two-week deadline, the end buyer could "request[] the full return" of its deposit. (Dkt. #86-2 at 27).

## C. DDGI Fails to Procure the Masks.

As it turns out, DDGI did not actually have masks in its possession, nor was it an authorized 3M distributor.[3] So to fulfill R Negotiations' order, DDGI needed to buy the masks from an authorized 3M distributor or other third party. DDGI's attempts to do so were unsuccessful. According to Fritz, DDGI's first attempt to source the masks "fell through when laws were put in place restricting the export of masks out of Germany." (Dkt. #95-1 ¶ 1).

Then, at some point during the two-week delivery window, Fritz says he began negotiating with a company called Primex Clinical Laboratories, Inc. (Dkt. #95-1 ¶ 3). Primex was not itself an authorized 3M distributor but apparently had a relationship with one. *See* (Dkt. #95 at 13); (Dkt. #95-1 ¶¶ 3–5). During the negotiations, Fritz learned that Primex could not supply the full quantity of masks (three million) or specific N95 model (1860) that R Negotiations had ordered. (Dkt. #95-1 ¶ 4). But it could supply 1.5 million units of a different N95 model (8210). (Dkt. #95-1 ¶ 4). Fritz avers that he conveyed this information to Podolak, who gave him the go-ahead to

---

[3] The parties dispute whether Kuczinski and R Negotiations knew this when they entered into the agreement. *Compare* (Dkt. #86-2 at 4) ("In these conversations, Fritz represented that [DDGI] was a certified distributor of 3M products and could procure the model 1860 N95 masks."), *with* (Dkt. #95-1 ¶¶ 2, 8) ("Mr. Podolak, Mr. Warner and Mr. Kuczynski knew that DDGI did not own the masks but that we had a relationship with an authorized reseller who was connected to an authorized 3M distributor. . . . At no time did I ever inform [Kuczinski] that I or any [of] my companies was a 3M authorized distributor.").

"substitute model 8210 with the model 1860" and purchase "the lesser quantity." (Dkt. #95-1 ¶ 4). Based on this conversation, Fritz sent a purchase order to Primex on April 27 for 1.5 million 3M model 8210 N95 masks. *See* (Dkt. #95-6).

Two days later, Primex sent back an invoice, confirming DDGI's order at a total price of $2.269 million.[4] *See* (Dkt. #95-11). Fritz immediately forwarded the invoice to Podolak and requested authorization to "continue with this order" from Primex. (Dkt. #95-10 at 1). Podolak responded in the affirmative: "We are a go!" (Dkt. #95-10 at 1). Fritz then proceeded to transfer $2.269 million to Primex from DDGI's Morgan Stanley account. (Dkt. #95-1 ¶ 6); (Dkt. #95-12); (Dkt. #86-11 at 2).

What happened next is not entirely clear. According to Fritz, Primex never delivered the masks to DDGI, thereby "defraud[ing] everyone." (Dkt. #95 at 16); (Dkt. #95-1 ¶ 18). In any event, neither R Negotiations nor CHU received any masks from DDGI, as part of the Primex transaction or otherwise. (Dkt. #86-2 at 7).

**D. R Negotiations Seeks Return of the Deposit from DDGI.**

Three weeks after the April 16 Letter—i.e., one week after the deadline—DDGI still had not delivered any masks, so Kuczinski, at CHU's direction, emailed Fritz requesting return of the deposit. *See* (Dkt. #86-2 at 37). Fritz demurred, explaining that he had already ordered 1.5 million masks from Primex and transferred nearly half of the deposit money as part of that transaction. (Dkt. #86-2 at 37). Kuczinski insisted, noting that DDGI did not "perform within 14 days of the agreement" and was therefore "in breach of that agreement." (Dkt. #86-2 at 36).

---

[4] The Primex invoice did not include a delivery date. *See* (Dkt. #95-11) (Primex invoice listing delivery date as "TBD").

The next day, in an email to Robert Werner dated May 8, 2020, Fritz attempted to assuage R Negotiations' concerns:

> I have enclosed the supporting documents for the Canada Order. Please note we received $5,250,000 From [Kuczinski's] escrow account to Morgan Stanley. WE proceeded to place the order for 1.5 mill units with our distributor Primex. WE paid the deposit to Primex approximately 50% of the cost of the order. *The balance is still in our account at Morgan Stanley. Fully accounted for and proper.* Please advise if there is anything further you require.

(Dkt. #86-2 at 41–42) (emphasis added). Importantly, Fritz represented in his May 8 email that the $5.25 million deposit (minus the $2.269 million paid to Primex) was "still in [DDGI's] account at Morgan Stanley," "[f]ully accounted for and proper." (Dkt. #86-2 at 41); *see also* (Dkt. #86-4 at 61) (Fritz deposition testimony confirming this interpretation of his May 8 email). Kuczinski responded with an ultimatum: "This is the last communication I will send to you demanding the immediate return of my client's escrow money. I expect the same to be done by 2 PM EST today." (Dkt. #86-2 at 40).

## E. DDGI Fails to Return the Deposit.

DDGI did not return any of the deposit money or deliver any masks—then or ever. (Dkt. #86-2 at 7). As CHU later learned, within days of receiving the $5.25 million deposit, Fritz began to transfer that money out of DDGI's Morgan Stanley account for personal and business purposes unrelated to the transaction. (Dkt. #86 at 13–14). By July 2020, there was almost no money left to return. *See* (Dkt. #86-11 at 2–4). Bank records show the following activity in DDGI's Morgan Stanley account, starting with CHU's deposit on April 15:

- **$5,250,000.00** received from Kuczinski on April 15. (Dkt. #86-11 at 2).

- **$1,250,000.00** sent to "Kuper Dis Tic San" on April 23. (Dkt. #86-11 at 2). Kuper was another DDGI client that ordered masks from, and paid a deposit to, DDGI. This money was used to reimburse Kuper's deposit when DDGI failed to deliver the masks under that agreement. *See* (Dkt. #86-4 at 53–54).

- **$2,269,575.00** sent to Primex on April 30. (Dkt. #86-11 at 2).

- **$531,463.78** sent to Hudson Title Group LLC on May 20. (Dkt. #86-11 at 3). Fritz used this money to buy back his personal residence—a house in McKinney, Texas—which had previously been foreclosed on. *See* (Dkt. #86-4 at 56–57).

- **$310,500.00** sent to Domestic Trading Company on May 22. (Dkt. #86-11 at 3). This money was used for an unrelated business transaction. *See* (Dkt. #86-4 at 57–58).

- **$60,000.00** sent to Ikon Supplies LLC on May 27. (Dkt. #86-11 at 3). This money was used for an unrelated business transaction. *See* (Dkt. #86-4 at 58).

- **$857,923.77** sent to Darrel Fritz on June 16. (Dkt. #86-11 at 4). This money was "temporarily" deposited in Fritz's personal bank account and later used for unrelated DDGI business transactions. *See* (Dkt. #95-1 ¶ 17).

When it became clear that DDGI would not be performing under the agreement, CHU cancelled its purchase orders with R Negotiations. *See* (Dkt. #86-2 at 8). Kuczinski then returned what was left of CHU's original deposit with R Negotiations—$18 million minus the $5.25 million transferred to DDGI. (Dkt. #86-2 at 8). To date, DDGI still has not returned any of the $5.25 million deposit that R Negotiations transferred to DDGI on CHU's behalf. (Dkt. #86-2 at 7).

**F. CHU Files This Lawsuit.**

CHU filed suit in March 2021. *See* (Dkt. #1). At the time, DDGI was void under Delaware law for failure to pay franchise taxes. (Dkt. #192 at 3). So CHU sued Fritz and a related "Dreamscape Development Group" entity he owned—Dreamscape Development Group *Holdings*, Inc. ("DDGHI"). *See* (Dkt. #1); (Dkt. #192 at 3). Fritz

8

and DDGHI took issue with CHU's failure to sue DDGI, *see* (Dkt. #32 at 4–5), so CHU later added DDGI as a defendant, *see* (Dkt. #45).

CHU brings claims against Fritz, DDGI, and DDGHI for breach of contract, unjust enrichment, conversion, theft, and fraud. (Dkt. #45 ¶¶ 41–78). CHU now moves for summary judgment on all of its claims. (Dkt. #86).

## II. LEGAL STANDARD

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd ex. rel. Est. Of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting FED. R. CIV. P. 56(a)). If the moving party presents a motion for summary judgment that is properly supported by evidence, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).

Because Federal Rule of Civil Procedure 56 requires that there be no "genuine issue of *material* fact" to succeed on a motion for summary judgment, "the mere existence of *some* alleged factual dispute" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (first emphasis omitted). A fact is "material" when, under the relevant substantive law, its resolution might govern the outcome of the suit. *Id.*

at 248. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton*, 232 F.3d at 477.

Courts consider the evidence in the light most favorable to the nonmovant, but the nonmovant may not rely on mere allegations in the pleading; rather, the nonmovant must respond to the motion for summary judgment by providing particular facts showing that there is a genuine issue for trial. *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000). If, when considering the entire record, no rational jury could find for the nonmoving party, the movant is entitled to summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

### A. Preliminary Issues

Before addressing CHU's substantive claims, the Court must resolve two preliminary issues: First, does DDGI still exist such that it is a proper party to this action? Second, which Defendant(s), if any, may be held liable for the conduct at issue in this case?

#### i. DDGI exists and is a proper party to this action.

Delaware law governs DDGI's existence. A federal court sitting in diversity applies the choice-of-law rules of the forum state—here, Texas. *Carson v. USAA Cas. Ins. Co.*, 110 F.4th 791, 793 n.4 (5th Cir. 2024). Under Texas law, the law of the state of incorporation governs a corporation's internal affairs, including its rights, powers,

10

and existence. TEX. BUS. ORGS. CODE §§ 1.102, 1.105; *Doucakis v. Speiser, Krause, Madole, P.C.*, No. 08-00-00296-CV, 2002 WL 1397155, at *3 (Tex. App.—El Paso June 27, 2002, pet. denied) ("Whether a foreign corporation exists for the purpose of prosecuting and defending a suit is determined by the law of the place of its incorporation."). DDGI is a Delaware corporation, (Dkt. #190 at 2), so Delaware law governs its existence.

CHU did not name DDGI in its original complaint because, at that time, DDGI was void under Delaware law for failure to pay franchise taxes and, therefore, did not have the capacity to be sued. (Dkt. #192 at 2–3); *see* DEL. CODE ANN. tit. 8, § 510 ("If any corporation . . . neglects or refuses for 1 year to pay the State any franchise tax or taxes . . . the charter of the corporation shall be void, and all powers conferred by law upon the corporation are declared inoperative[.]"). But DDGI has since been revived under the name "Dreamscape Development Group 2016 Inc." *See* (Dkt. #190-1 at 1) (Affidavit of Darrel Fritz confirming DDGI's revival); (Dkt. #190-1 at 3) (Certificate for Revival of Charter); (Dkt. #190-1 at 4) (Delaware Secretary of State website showing Dreamscape Development Group 2016 Inc. in good standing).

Under Delaware law, a revived corporation is treated "as if its certificate of incorporation had not been forfeited or void." DEL. CODE ANN. tit. 8, § 312(e). Thus, revival retroactively "validate[s] all contracts, acts, matters and things made, done and performed . . . by the corporation . . . during the time when its certificate of incorporation was forfeited or void." *Id.* A revived corporation is therefore "as exclusively liable for all contracts, acts, matters and things made, done or performed

11

in its name and on its behalf . . . prior to its revival, as if its certificate of incorporation had at all times remained in full force and effect." *Id.*

DDGI has been revived, so it exists and is a proper party to this action. That DDGI may have been void when this suit was filed is now immaterial. *See id.*

**ii. All three defendants may be held liable for DDGI's conduct.**

Having found DDGI to be a proper party, the Court must now determine which Defendant(s) may be held liable for the conduct at issue in this case. Defendants have made that task easier by stipulating to joint and several liability among themselves. (Dkt. #157 at 4) ("For purposes of this case, Defendants stipulate that each is liable for the actions of the other and that each is joint[ly] and severally liable for any judgment against the other."). So if any one of them is liable, all are liable. *See Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, No. MO:19-CV-173-DC, 2021 WL 2772808, at *14–15 (W.D. Tex. Apr. 28, 2021) (enforcing stipulation of joint and several liability). Thus, the Court need only determine which Defendant, if any, is *directly* liable.

All five of CHU's claims center on the alleged breach of the mask-purchase agreement that R Negotiations entered into on CHU's behalf. Thus, to determine which Defendant is directly liable here, the Court must determine which Defendant was party to that agreement. Neither CHU nor Defendants have presented evidence that DDGHI participated in the transaction or the disposition of CHU's deposit. Fritz purported to act only on *DDGI's* behalf, (Dkt. #86-2 at 4); *DDGHI's* name does not appear on any of the documents relevant to the agreement, *see* (Dkt. #86-2 at 23, 25,

27). Because the record is devoid of evidence against DDGHI, it cannot be held directly liable.

That leaves DDGI and Fritz. In its motion, CHU argues that Fritz acted "in his personal capacity from April 2020 through June 2020," and is therefore directly liable, "because DDGI was a void corporation with no legal capacity at this time." (Dkt. #86 at 14). But as explained above, DDGI has since been revived. That revival retroactively validated all contracts and other acts performed on DDGI's behalf. *See* DEL. CODE ANN. tit. 8, § 312(e). Thus, DDGI may be held "exclusively liable" for those contracts and acts, "as if its certificate of incorporation had at all times remained in full force and effect." *Id.*

Given DDGI's revival, it is DDGI—not Fritz personally—that is directly liable under the mask-purchase agreement. "In a contract suit involving a corporation, officers will not be held personally liable as long as they sign the contract in their capacity as agents and do not purport to bind themselves personally." *Hammer v. Howard Med., Inc.*, No. CV S15C-05-006 RFS, 2017 WL 1180085, at *2 (Del. Super. Ct. Feb. 14, 2017). The record reflects that Fritz entered into the mask-purchase agreement in his capacity as president and CEO of DDGI and did not purport to bind himself personally. *See* (Dkt. #86-2 at 25) (invoice issued by DDGI); (Dkt. #86-2 at 4) (Fritz "purported to be the president of [DDGI]" and "represented that [DDGI] . . . could procure the model 1860 N95 masks"). Thus, Fritz is not directly liable under the mask-purchase agreement.

13

In sum, DDGI was party to the mask-purchase agreement and, therefore, may be held directly liable for wrongful conduct related to that agreement. DDGHI and Fritz, though not directly liable, may be held liable for DDGI's conduct via their stipulation of joint and several liability.[5]

## B. Breach of Contract

CHU's first substantive claim is for breach of contract. CHU argues that it entered into an enforceable contract with DDGI (through R Negotiations) for the sale of three million masks, and that DDGI breached that contract by failing to deliver the masks or return its deposit. (Dkt. #86 at 16–22).

A federal court sitting in diversity applies the substantive law of the state in which it sits—here, Texas. *G & C Land v. Farmland Mgmt. Servs.*, 587 F.App'x 99, 104 (5th Cir. 2014) (per curiam). The parties agree that Texas law applies to CHU's substantive claims, including its breach of contract claim. *See* (Dkt. #86 at 16); (Dkt. #95 at 27). As to the contract claim specifically, Texas's version of the Uniform Commercial Code ("UCC") applies because the contract at issue is for the sale of goods. *See* TEX. BUS. & COM. CODE §§ 2.102, 2.105. The UCC displaces conflicting common law rules governing breach of contract claims. *ETC Intrastate Procurement Co. v. JSW Steel (USA), Inc.*, 620 S.W.3d 168, 174 (Tex. App.—Houston [14th Dist.] 2021, no pet.). But "[t]o the extent that there is no conflict, common law principles complement the UCC." *Id.*

---

[5] CHU argues that DDGI and DDGHI are liable as Fritz's alter egos. (Dkt. #86 at 32–35). Because the Court finds that DDGI is directly liable, and DDGHI is liable via the stipulation of joint and several liability, the Court need not consider CHU's alter-ego claim.

To succeed on a breach of contract claim, the plaintiff must prove that "(1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; (3) the defendant breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). The Court addresses each element in turn, as well as CHU's standing to sue on the contract.

### i. CHU and DDGI entered into a valid contract.

The four basic elements of an enforceable contract are: "(1) offer; (2) acceptance; (3) a meeting of the minds as to subject matter and essential terms; and (4) consideration or mutuality of obligation." *Empire Torque Tools, LLC v. Specialty Welding & Turnarounds, LLC*, No. CV H-21-3274, 2022 WL 19569543, at *1 (S.D. Tex. Apr. 26, 2022) (cleaned up). The UCC supplements these elements. *Id.* It provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." TEX. BUS. & COM. CODE § 2.204(a). The UCC further provides that contracts "for the sale of goods for the price of $500 or more" must be in writing and "signed by the party against whom enforcement is sought." TEX. BUS. & COM. CODE § 2.201(a).

There is no genuine dispute that DDGI and CHU (through R Negotiations) entered into an enforceable contract for the sale of three million masks. *See infra* Part III.B.v. (explaining that CHU is a party to, and may sue on, the mask-purchase

contract because R Negotiations entered into the contract as CHU's agent). All four elements are met: First, CHU made an offer via the purchase order, (Dkt. #86-2 at 23). "An offer is 'an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal.'" *Avialae S De RL De CV v. Cummins Inc.*, 472 F.Supp.3d 340, 347 (W.D. Tex. 2020) (quoting *Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Int'l (N. Sea), Ltd.*, 7 F.3d 1230, 1232–33 (5th Cir. 1993)). "An order for goods issued by a buyer to seller, or a 'purchase order,' is often the first document having the legal attributes of an offer." *Id.* (cleaned up). The purchase order here is no different. It states the essential terms of the proposed agreement and invites DDGI to accept the offer by signing. *See* (Dkt #86-2 at 23).

Second, DDGI accepted the offer via its invoice, (Dkt. #86-2 at 25). The UCC defines acceptance in terms of the offer that preceded it: "Unless otherwise unambiguously indicated by the language or circumstances[,] . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances[.]" TEX. BUS. & COM. CODE § 2.206(a)(1). Relevant here, "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of [the] goods." TEX. BUS. & COM. CODE § 2.206(a)(2). Here, although CHU's purchase order explicitly invited acceptance by signature, it did not unambiguously require a signature as the exclusive method of acceptance. *See* (Dkt. #86-2 at 23). DDGI's confirmatory invoice was also "reasonable in the

16

circumstances" as a "prompt promise to ship" the masks. TEX. BUS. & COM. CODE § 2.206(a)(1)–(2). It therefore operated as a valid acceptance.

Before addressing the third element of an enforceable contract, the Court considers the April 16 Letter's role in contract formation. If the purchase order was an offer, and the invoice an acceptance, what role does the April 16 Letter play? CHU theorizes that the April 16 Letter is either a "written confirmation" of the mask-purchase agreement, an "agreed modification" to that "pre-existing contract," or a "standalone contract." (Dkt. #86 at 17–19).

The April 16 Letter is not a standalone contract. It clearly exists in the context of the purchase order and invoice that came before it, which themselves created a binding contract. *See* (Dkt. #86-2 at 27) ("[P]lease accept this letter *as confirmation of our agreement*[.]" (emphasis added)). Nor is the April 16 Letter merely a "written confirmation" of the mask-purchase agreement. Although the Letter purported to be a mere "confirmation" of the parties' agreement, it altered at least one term in the invoice, albeit slightly. *Compare* (Dkt. #86-2 at 25) (estimating delivery at "5–7 days . . . after payment receipt confirmation"), *with* (Dkt. #86-2 at 27) (requiring delivery "within two weeks of today"). And it required DDGI "to take further action in order to signal acceptance (signing and returning a copy of the letter agreement)." *Great W. Sugar Co. v. Lone Star Donut Co.*, 567 F.Supp. 340, 342 (N.D. Tex. 1983). "A true confirmation requires no response." *Id.*

The April 16 Letter is therefore a modification to the pre-existing contract created by the purchase order and invoice. "Modification of a contract is some change

17

in an original agreement which introduces a new or different element into the details of the contract but leaves its general purpose and effect undisturbed." *Enserch Corp. v. Rebich*, 925 S.W.2d 75, 83 (Tex. App.—Tyler 1996, writ dism'd by agr.). The April 16 Letter does just that. It introduces a two-week production deadline and emphasizes that the $5.25 million deposit should be held in escrow but leaves the basic terms of the purchase order and invoice undisturbed. *See* (Dkt. #86-2 at 27). Under the UCC, contract modifications "need[] no consideration to be binding." TEX. BUS. & COM. CODE § 2.209(a). But they must satisfy the statute of frauds "if the contract as modified is within its provisions." TEX. BUS. & COM. CODE § 2.209(c). The April 16 Letter is signed by Fritz on DDGI's behalf, so it's a valid modification. *See* (Dkt. #86-2 at 27).

Moving now to the third element of an enforceable contract, the Court finds that the parties had a meeting of the minds as to the agreement's subject matter and essential terms. "Under the UCC, the only essential term that must be contained in a written agreement for the sale of goods over $500 is the quantity." *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 240 (5th Cir. 2012); *see* TEX. BUS. & COM. CODE § 2.201(a). Here, the purchase order, invoice, and April 16 Letter all contain the same subject matter and quantity—three million masks. *See* (Dkt. #86-2 at 23, 25, 27).

Fourth, the mask-purchase agreement was supported by consideration. Consideration is a bargained-for exchange in which each party gives or promises something of legal value. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492,

18

496 (Tex. 1991). Here, DDGI promised to deliver three million masks; in exchange, CHU promised to pay $10.5 million. *See* (Dkt. #86-2 at 23, 25, 27).

In sum, there is no genuine dispute that the parties entered into an enforceable contract for the purchase of three million masks at a price of $10.5 million. All four elements of contract formation are met, and the contract satisfies the statute of frauds—it is in writing and signed by Fritz as DDGI's "authorized agent." *See* TEX. BUS. & COM. CODE § 2.201(a); (Dkt. #86-2 at 27). The terms of the contract are contained in three documents—the purchase order, the invoice, and the April 16 Letter. (Dkt. #86-2 at 23, 25, 27). As a valid modification to the contract and the most recent expression of the parties' agreement, the April 16 Letter controls to the extent it conflicts with the terms of the purchase order or invoice. *See S.A. Dome, L.L.C. v. Maloney Dev. P'ship, Ltd.*, No. 04-04-00586-CV, 2005 WL 1398106, at *4 (Tex. App.— San Antonio June 15, 2005, no pet.) ("When parties to a contract make a valid modification of their contract, . . . the terms of the latest contract control.").

### ii. CHU performed under the contract.

The second element of a breach-of-contract claim requires plaintiff to prove that it "performed or tendered performance as contractually required." *Pathfinder*, 574 S.W.3d at 890. In a contract for the sale of goods, "[t]he obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." TEX. BUS. & COM. CODE § 2.301. Here, CHU fulfilled its obligations under the contract. It paid half of the purchase price upfront and stood ready to pay the other half upon delivery of the masks.

### iii. DDGI breached the contract.

The third element of a breach-of-contract claim requires plaintiff to show that "the defendant breached the contract by failing to perform or tender performance as contractually required." *Pathfinder*, 574 S.W.3d at 890. As previously explained, a seller's obligation in a contract for the sale of goods is "to transfer and deliver [the goods] . . . in accordance with the contract." TEX. BUS. & COM. CODE § 2.301.

Here, per the April 16 Letter, DDGI had an obligation to return CHU's $5.25 million deposit if it failed to "produce the entire or at least a partial order of the masks within two weeks." (Dkt. #86-2 at 27). According to Defendants, the April 16 Letter did not actually require DDGI to deliver or produce any *masks* by the two-week deadline. Rather, it required only that DDGI order masks from a distributor and produce *a copy of that order* by the two-week deadline. *See* (Dkt. #95 at 29–31). DDGI satisfied that obligation, it says, by ordering masks from Primex and producing a copy of that order by the two-week deadline. *See* (Dkt. #95 at 30–31).

Defendants' interpretation of the April 16 Letter strains credulity. The April 16 Letter made clear that the end buyer was in "dire need" of "*masks*"—not a piece of paper from yet another distributor. (Dkt. #86-2 at 27) (emphasis added). The end buyer therefore "placed a time limit on the production of *these masks*." (Dkt. #86-2 at 27) (emphasis added). In this context, "produce" means to deliver or "to . . . provide (something) for . . . use." *Produce (v.)*, Oxford English Dictionary, https://www.oed.com/dictionary/produce_v (last visited March 30, 2026). And the "order of the masks" clearly refers to the masks themselves, not an order form. *See*

20

(Dkt. #86-2 at 27). Thus, DDGI had an obligation to either deliver the masks by the two-week deadline or return the deposit. It did neither and therefore breached the contract.

### iv. CHU sustained damages.

The fourth element of a breach-of-contract claim requires plaintiff to prove that it "sustained damages due to the breach." *Pathfinder*, 574 S.W.3d at 890. There is no genuine dispute that CHU sustained damages here. CHU paid DDGI an upfront deposit of $5.25 million for goods it never received, and DDGI never returned the deposit, in breach of the contract. CHU therefore sustained at least $5.25 million in damages. *See* TEX. BUS. & COM. CODE § 2.711(a) ("Where the seller fails to make delivery[,] . . . the buyer may cancel and . . . recover[] so much of the price as has been paid[.]").

### v. CHU has standing to enforce the contract.

Defendants argue that even if a valid contract existed between DDGI and R Negotiations, CHU was not a party to that contract and therefore lacks standing to sue under the contract. *See* (Dkt. #95 at 28–29, 34–35). Defendants are mistaken. CHU is a party to, and may sue on, the mask-purchase contract because R Negotiations entered into the contract as CHU's agent.

"[T]hree factual elements must exist in order to create an agency relationship: (1) the manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Roberts v. Driskill Holdings, Inc.*,

21

No. 03-99-000532-CV, 2000 WL 301195, at *2 (Tex. App.—Austin Mar. 23, 2000, no pet.) (not designated for publication). Put differently, the "evidence must establish that the principal has both the right: (1) to assign the agent's task; and (2) to control the means and details of the process by which the agent will accomplish that task." *Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App.—Corpus Christi–Edinburg 1998, pet. dism'd w.o.j.).

This test is easily satisfied here. CHU manifested that R Negotiations would purchase masks on its behalf. *See* (Dkt. #86-2 at 2–3, 12–17). R Negotiations accepted the undertaking. *See* (Dkt. #86-2 at 3). And the parties understood that CHU would control the means and details of the mask-buying process. CHU dictated the type of masks it needed, the deadline by which it needed them, and the price it was willing to pay. *See* (Dkt. #86-2 at 2–3); (Dkt. #86-2 at 27) (explaining that CHU, "the end buyer in this transaction, . . . has placed a time limit on the production of these masks"). For purposes of the mask-purchase contract with DDGI, then, R Negotiations was the agent and CHU the principal.[6]

A principal—whether disclosed or not—may sue on a contract made by its agent. *See Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003); *Sears Roebuck & Co. v. ACM Eng'g & Env't Servs.*, No. 14-11-00363-CV, 2012 WL 1137912, at *5 (Tex. App.—Houston [14th Dist.] Apr. 3, 2012, no pet.) ("An agent may make a contract for

---

[6] To be more specific, CHU was a partially disclosed principal because DDGI had notice of its existence but not its identity. *See* (Dkt. #86-2 at 27) (repeatedly referencing CHU as the "client" or "end buyer"); *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 275 (5th Cir. 1980) ("A principal is partially disclosed if at the time of the transaction the third party has notice of the existence of the agency relationship, but not the identity of the principal.").

an undisclosed principal in his own name, and the principal may sue or be sued on the contract."). Thus, CHU has standing to sue on the contract here.

*    *    *    *

For these reasons, the Court **GRANTS** summary judgment on CHU's breach of contract claim. Specifically, the Court holds that DDGI is directly liable to CHU for breach of contract and Fritz and DDGHI are jointly and severally liable to CHU for breach of contract. Defendants' liability encompasses the entirety of CHU's $5.25 million deposit with DDGI.

## C. Unjust Enrichment

Having found a valid, express contract between the parties, the Court must dismiss CHU's "alternative" unjust enrichment claim. (Dkt. #86 at 22–25). "Unjust enrichment claims are based on quasi-contract and are predicated on the absence of an express contract controlling the circumstances." *First Union Nat. Bank v. Richmont Cap. Partners I, L.P.*, 168 S.W.3d 917, 931 (Tex. App.—Dallas 2005, no pet.). Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory because parties should be bound by their express agreements." *Id.* CHU's unjust enrichment claim is therefore **DISMISSED**.

## D. Conversion

CHU argues that DDGI committed the tort of conversion by misappropriating, and ultimately failing to return, its $5.25 million deposit. (Dkt. #86 at 26–28).

23

"Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at *11 (Tex. App.—Dallas Aug. 28, 2017, pet. denied). To succeed on a claim for conversion, the plaintiff must prove that: "(1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property." *Id.* "The plaintiff also must establish it was injured by the conversion." *Id.*

Wrongful intent is not an element of conversion. *NXCESS Motor Cars, Inc. v. JPMorgan Chase Bank, N.A.*, 317 S.W.3d 462, 471 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "The requisite intent is only one to assert a right in the property[.]" *White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658, 662 (Tex. App.—Houston [14th Dist.] 1972, no writ). Thus, "[c]omplete innocence and perfect good faith are no defense to a conversion action." *Id.*

"When the subject of an alleged conversion is money, a plaintiff does not state an adequate claim merely by asserting that the defendant owes him money, or that the defendant 'ripped him off.'" *McIntosh v. Wiley*, No. 5:04-CV-120, 2006 WL 3691109, at *8 (S.D. Tex. Dec. 11, 2006). Rather, "since the theory of conversion by definition centers on the right to possession of specific tangible property, an action

24

will lie for conversion of money only when its identification is possible and there is an obligation to deliver the specific money in question, or otherwise particularly treat specific money." *Id.* (cleaned up). Thus, "[a]n action for conversion of money arises only where the money can be identified as a specific chattel, meaning it is: (1) delivered for safe keeping; (2) intended to be kept segregated; (3) substantially in the form in which it is received or an intact fund; and (4) not the subject of a title claim by the keeper." *Scott Pelley P.C.*, 2017 WL 3699823, at *11.

### i. CHU's deposit money was delivered for safekeeping and intended to be kept segregated.

The elements for conversion of money are satisfied here because, under the parties' agreement, CHU's deposit money was "delivered for safe keeping" and "intended to be kept segregated." *See id.* The April 16 Letter is instructive. It describes the $5.25 million as a "deposit" and "*escrow* payment" intended to be held in DDGI's "*escrow* account" with Morgan Stanley. (Dkt. #86-2 at 27) (emphasis added). And it required that DDGI "return . . . the above referenced *escrow*"—i.e., the $5.25 million deposit—if it couldn't fulfill the order within two weeks. (Dkt. #86-2 at 27) (emphasis added).

In context, this language imposed on DDGI a duty to preserve—that is, not spend or transfer—the deposit money until it delivered the masks. Specifically, the terms "deposit" and "escrow" in the April 16 Letter imply a duty of preservation. Used here, "deposit" refers to "money or other property" given "to another who promises to preserve it . . . and return it in kind." *Deposit, Black's Law Dictionary* (12th ed. 2024). More broadly, it is anything "placed for safekeeping." *Deposit*, Merriam-Webster,

25

https://www.merriam-webster.com/dictionary/deposit (last visited April 1, 2026). The term "escrow" similarly entails a duty of preservation, until certain conditions are met. *See Escrow, Black's Law Dictionary* (12th ed. 2024) ("The general arrangement under which a legal document or property is delivered to a third person until the occurrence of a condition."); *see also Account, Black's Law Dictionary* (12th ed. 2024) (defining "escrow account" as "[a] bank account . . . that is returnable to the depositor or paid to a third person on the fulfillment of specified conditions"). As one court put it, "[t]he very purpose of an escrow arrangement is to preserve the funds so they will be available for disbursement" when the conditions for their disbursement are met. *Graco Robotics, Inc. v. Oaklawn Bank*, 914 S.W.2d 633, 641 (Tex. App.—Texarkana 1995, writ dism'd); *see also In re Moshenberg*, 284 B.R. 532, 533 (Bankr. W.D.N.Y. 2002) ("The essence of an escrow is that the escrowed item or asset is to be held protectively, and is to be released without alteration or diminishment, upon satisfaction of the stated conditions for its release."); *Zucaro v. Venable*, No. 21 CIV. 8775 (JPC), 2023 WL 2691557, at *6 (S.D.N.Y. Mar. 29, 2023) ("[T]he purpose of an escrow agreement . . . is to provide a mechanism by which property may be maintained in stasis, on deposit with a third party until the occurrence of a condition, at which time the third party is to hand over the money to the promisee." (cleaned up)).

The parties' escrow arrangement here was unconventional, to be sure. Generally, escrowed funds are held by a neutral third party—not one of the parties to the transaction. *See Escrow, Black's Law Dictionary* (12th ed. 2024) (defining

26

"escrow" as property delivered "to a third party to be held by the third party"). Nevertheless, that DDGI itself held the funds did not relieve DDGI of its duty to preserve those funds.

In sum, CHU's deposit money was delivered to DDGI for "safe keeping" and was "intended to be kept segregated" as an "intact fund" in DDGI's Morgan Stanley account until DDGI delivered the masks. *See Scott Pelley P.C.*, 2017 WL 3699823, at *11. The deposit money was not "the subject of a title claim by" DDGI because DDGI never delivered the masks. *Id.* Thus, the elements for conversion of money are satisfied here.

### ii. DDGI converted portions of CHU's deposit money.

There is no genuine dispute that DDGI converted *at least some* of CHU's deposit money. Specifically, DDGI converted those portions of CHU's deposit money that it (a) transferred for personal or business uses unrelated to the mask-purchase contract or (b) retained and refused to return. However, a fact issue exists as to the $2.269 million that DDGI transferred to Primex in an attempt to procure masks for CHU.

The first element of conversion—ownership—is satisfied here. CHU never surrendered ownership of its deposit because DDGI never performed under the contract. When the two-week delivery deadline passed, CHU also became entitled to possession of the deposit under the parties' agreement. *See* (Dkt. #86-2 at 27). So at the time of the alleged conversions, CHU either "owned" or was "entitle[d] to possession" of the deposit money. *Scott Pelley P.C.*, 2017 WL 3699823, at *11.

27

The second element of conversion requires that "the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner." *Id.* DDGI "exercised control over" CHU's deposit when it transferred portions of the deposit from its Morgan Stanley account and refused to return the rest. *Id.* The question here is whether DDGI exercised control "unlawfully and without authorization . . . to the exclusion of, or inconsistent with, [CHU's] rights as an owner." *Id.* To answer this question, the Court must consider each transfer separately.

CHU identifies six allegedly unauthorized transfers from DDGI's Morgan Stanley account:

- **$1,250,000.00** sent to "Kuper Dis Tic San" on April 23. (Dkt. #86-11 at 2). Kuper was another DDGI client that ordered masks from, and paid a deposit to, DDGI. This money was used to reimburse Kuper's deposit when DDGI failed to deliver the masks under that agreement. *See* (Dkt. #86-4 at 53–54).

- **$531,463.78** sent to Hudson Title Group LLC on May 20. (Dkt. #86-11 at 3). Fritz used this money to buy back his personal residence—a house in McKinney, Texas—which had previously been foreclosed on. *See* (Dkt. #86-4 at 56–57).

- **$2,269,575.00** sent to Primex on April 30. (Dkt. #86-11 at 2).

- **$310,500.00** sent to Domestic Trading Company on May 22. (Dkt. #86-11 at 3). This money was used for an unrelated business transaction. *See* (Dkt. #86-4 at 57–58).

- **$60,000.00** sent to Ikon Supplies LLC on May 27. (Dkt. #86-11 at 3). This money was used for an unrelated business transaction. *See* (Dkt. #86-4 at 58).

- **$857,923.77** sent to Darrel Fritz on June 16. (Dkt. #86-11 at 4). This money was "temporarily" deposited in Fritz's personal bank account and later used for unrelated DDGI business transactions. *See* (Dkt. #95-1 ¶ 17).

There is no genuine dispute that five of these transfers were made without authorization. As explained above, DDGI had a contractual obligation to preserve and return CHU's deposit if it failed to deliver within two weeks. *See supra* Part III.D.i. At the very least, DDGI could not transfer or spend the money for personal or business uses unrelated to the parties' contract, unless it first received authorization. All but the April 30 transfer to Primex were for unauthorized personal or unrelated business uses, so those transfers constituted conversion. DDGI also converted any deposit money remaining in the Morgan Stanley account, which it had an obligation to return.

The April 30 transfer to Primex is not so easy. On the one hand, the parties' written contract suggests that DDGI could not transfer or spend the deposit money for any reason—even in furtherance of the contract. *See* (Dkt. #86-2 at 27). But on the other hand, the record reflects that R Negotiations expressly authorized the Primex transaction. *See supra* Part I.C. Before transferring the $2.269 million to Primex, Fritz forwarded the Primex invoice to Brian Podolak of R Negotiations and requested authorization to "continue with this order." (Dkt. #95-10 at 1). Podolak responded, "We are a go!" (Dkt. #95-10 at 1). Did Podolak's authorization of the Primex transaction extend to DDGI's transfer of the deposit money for that transaction? Maybe. Maybe not. The evidence raises a genuine issue as to whether the Primex transfer was authorized. That issue is material because "[t]here can be no conversion where the owner has expressly or impliedly assented to the taking or disposition." *See Robinson v. Nat'l Autotech, Inc.*, 117 S.W.3d 37, 39–40 (Tex. App.—Dallas 2003,

29

pet. denied). Summary judgment is therefore inappropriate as to the $2.269 million Primex transfer.

Because there is a genuine issue as to the Primex transfer, the amount of that transfer is not recoverable on summary judgment. "An action will lie for conversion of money only when its identification is possible and there is an obligation to deliver the *specific money* in question, or otherwise particularly treat *specific money*." *McIntosh*, 2006 WL 3691109, at *8 (cleaned up) (emphasis added). "Conversion does not lie for indebtedness that may be discharged by the payment of money generally." *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147, 165 (Tex. App.—Eastland 2001, pet. denied). If DDGI was authorized to transfer the $2.269 million to Primex, DDGI no longer had an obligation to return that "specific money" when the two-week deadline expired. *McIntosh*, 2006 WL 3691109, at *8. Upon transfer, the $2.269 million lost its status as specific chattel and became mere "indebtedness" that could be "discharged by the payment of money generally." *Cone*, 68 S.W.3d at 165. Thus, CHU cannot recover the $2.269 million on summary judgment as conversion damages. *See Castaneda v. Fassio*, No. 13-94-172-CV, 1998 WL 34288695, at *3 (Tex. App.—Corpus Christi–Edinburg May 28, 1998, pet. denied) (not designated for publication) ("[T]he correct measure of damages for conversion or wrongful detention of money is the amount of money detained or converted, plus interest.").

The third and fourth elements of conversion are easily satisfied here. CHU demanded return of its deposit, and DDGI refused. *See* (Dkt. #86-2 at 36–37, 40).

\*    \*    \*    \*

For these reasons, the Court **GRANTS in part** and **DENIES in part** summary judgment on CHU's conversion claim. Specifically, the Court holds that, as to CHU's $5.25 million deposit, minus the $2,269,575.00 sent to Primex on April 30, (Dkt. #86-11 at 2), DDGI is directly liable to CHU for conversion and Fritz and DDGHI are jointly and severally liable to CHU for conversion.

## E. Theft

CHU's theft claim is much the same as its conversion claim. CHU argues that DDGI committed civil theft under the Texas Theft Liability Act ("TTLA") by misappropriating, and ultimately failing to return, its $5.25 million deposit. (Dkt. #86 at 28–30).

To succeed on a claim for civil theft under the TTLA, a plaintiff must establish three elements: "(1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft." *In re Minardi*, 536 B.R. 171, 185–86 (Bankr. E.D. Tex. 2015); *see* TEX. CIV. PRAC. & REM. CODE § 134.002.

As with CHU's conversion claim, there is no genuine dispute that DDGI committed theft as to those portions of CHU's deposit that it (a) transferred for personal or business uses unrelated to the mask-purchase contract or (b) retained and refused to return.

31

First, under the parties' agreement, CHU had a right to the return of its deposit if DDGI failed to deliver the masks within two weeks. *See supra* Part III.B.iii.; (Dkt. #86-2 at 27). DDGI never delivered the masks, so CHU had a possessory right to the deposit money when the two-week deadline expired.

Second, DDGI unlawfully appropriated *at least some* of CHU's deposit, in violation of the theft provisions of the Texas Penal Code. Under the Texas Penal Code, "a person commits [theft] if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). An appropriation of property is unlawful if it is "without the owner's effective consent." TEX. PENAL CODE § 31.03(b)(1); *see also* TEX. PENAL CODE § 31.01(4) (defining "appropriate" as "to bring about a transfer [of property,]" or "to acquire or otherwise exercise control over property").

Here, DDGI unlawfully appropriated those portions of CHU's deposit that it (a) transferred for personal or business uses unrelated to the mask-purchase contract or (b) retained and refused to return. The parties' agreement prohibited DDGI from making those transfers or retaining any portion of CHU's deposit after the two-week delivery deadline. *See supra* Part III.D.i. However, a genuine dispute exists as to whether the $2.269 million Primex transfer was "without [CHU's] effective consent." TEX. PENAL CODE § 31.03(b)(1); *see supra* Part III.D.ii.

The evidence also establishes that DDGI, through Fritz, intended to deprive CHU of those portions of the deposit that it unlawfully appropriated. For purposes of the intent requirement, "deprive" means "to withhold property from the owner

32

permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner," or "to dispose of property in a manner that makes recovery of the property by the owner unlikely." TEX. PENAL CODE § 31.01(2)(A), (C). "The relevant 'intent to deprive' is the person's intent at the time of the taking." *Matter of Rose*, 156 F.4th 602, 621 (5th Cir. 2025) (cleaned up). It is "typically proven through circumstantial evidence and may be inferred from the alleged thief's acts, words, and conduct." *Id.* (cleaned up). "Evidence of actual deprivation may be evidence of intent to deprive." *Id.* (cleaned up).

Fritz's May 8 email demonstrates his intent to deprive. In that email, Fritz represented to R Negotiations that the $5.25 million deposit (minus the $2.269 million paid to Primex) was "still in [DDGI's] account at Morgan Stanley," "[f]ully accounted for and proper." (Dkt. #86-2 at 41); *see* (Dkt. #86-4 at 61). But by that time, Fritz had already transferred $1.25 million of the deposit money to another DDGI client, as reimbursement for that client's deposit. *See supra* Part I.E. Fritz's deceptive email strongly suggests that, at the time he made the unauthorized transfers, Fritz knew the unlawfulness of his conduct and had no intention of returning CHU's deposit.

Fritz's post-email conduct confirms his intent to deprive. After assuring R Negotiations that its deposit was safe, Fritz proceeded to transfer nearly all of the remaining deposit money, with no apparent plan for returning the deposit if DDGI could not deliver the masks. He even used some of the deposit money to purchase his personal residence out of foreclosure. *See supra* Part I.E. Importantly, Fritz made

33

many of these unauthorized transfers after the two-week delivery deadline, when CHU had a present possessory right to the deposit and R Negotiations had already demanded its return. *See supra* Part I.E. Thus, "at the time of the taking," Fritz knew that DDGI had an obligation to return the deposit money and spent it anyway. *See Matter of Rose*, 156 F.4th at 621. Perhaps predictably, then, DDGI never returned the money, permanently depriving CHU of its deposit. In sum, the evidence establishes that DDGI, through Fritz, intended to withhold CHU's deposit for an extended period of time or, at the very least, to dispose of it in a way that would make recovery unlikely. *See* TEX. PENAL CODE § 31.01(2)(A), (C).

Third and finally, CHU sustained damages because DDGI never returned those portions of the deposit that it unlawfully appropriated.

For these reasons, the Court **GRANTS in part** and **DENIES in part** summary judgment on CHU's theft claim. Specifically, the Court holds that, as to CHU's $5.25 million deposit, minus the $2,269,575.00 sent to Primex on April 30, (Dkt. #86-11 at 2), DDGI is directly liable to CHU for theft under the TTLA and Fritz and DDGHI are jointly and severally liable to CHU for theft under the TTLA.

## F. Fraud

CHU bases its fraud claim on two alleged misrepresentations. According to CHU, Fritz falsely represented (1) that DDGI was an authorized 3M distributor and (2) that DDGI could deliver the masks within approximately five to seven days. (Dkt. #86 at 30). Because a genuine issue of material fact exists as to both alleged misrepresentations, the Court must deny CHU's fraud claim.

To succeed on a fraud claim, the plaintiff must prove "(1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001).

CHU has failed to meet its summary-judgment burden as to Fritz's first alleged misrepresentation—that DDGI was an authorized 3M distributor. The first element of fraud is "that a material representation was made." *Id.* CHU's only evidence that Fritz made the alleged misrepresentation is Kuczinski's signed declaration saying that he did. *See* (Dkt. #86-2 at 4) ("In these conversations, Fritz represented that [DDGI] was a certified distributor of 3M products[.]"). But Fritz submitted a signed affidavit directly contradicting Kuczinski's account. *See* (Dkt. #95-1 ¶8) ("At no time did I ever inform [Kuczinski] that I or any [of] my companies was a 3M authorized distributor."). Thus, there is a genuine dispute as to whether Fritz represented that DDGI was an authorized 3M distributor.

CHU has also failed to meet its summary-judgment burden as to Fritz's second alleged misrepresentation. As an initial matter, the precise terms of the alleged misrepresentation are not clear. According to CHU, Fritz represented during negotiations that "he could deliver the masks within approximately 5–7 days." (Dkt. #86 at 30). That's generally consistent with Kuczinski's declaration, (Dkt. #86-2

35

at 4), and DDGI's invoice, (Dkt. #86-2 at 25). But it ignores the April 16 letter, which came later and set a different, two-week delivery deadline. *See* (Dkt. #86-2 at 27). So it's not clear that Fritz's initial five-to-seven-days promise survived the April 16 Letter. Complicating things further, Fritz testified that he told R Negotiations they could "assume once the order is placed and the payment is made, deliverable is within seven to ten days of some nature." (Dkt. #86-4 at 42).

Whatever its exact terms, Fritz's second alleged misrepresentation is a promise of future performance. While a promise of future performance can constitute an actionable misrepresentation, fraud claims based on such a promise require a heightened showing of fraudulent intent. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). That is, in addition to proving the basic elements of fraud, the plaintiff must prove that the defendant made the alleged promise with the "intent to deceive" and with "no intention of performing as represented." *Id.* "Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774–75 (Tex. 2009) (cleaned up). Fraudulent intent "may be inferred from the party's subsequent acts after the representation is made," *id.* at 775 (cleaned up), but "the mere failure to perform a contract is not evidence of fraud," *Formosa Plastics*, 960 S.W.2d at 48.

Viewing the evidence in the light most favorable to Defendants, the Court cannot conclude that Fritz had no intention of performing at the time he made the

36

alleged promise. Although DDGI ultimately never delivered the masks—much less within five to seven days—the record reflects that Fritz at least attempted to procure the masks after making the alleged promise. *See supra* Part I.C. For example, Fritz states in his affidavit that he "initially located a source out of Germany but that opportunity fell through when laws were put in place restricting the export of masks out of Germany." (Dkt. #95-1 ¶ 1). And, of course, Fritz presented evidence that he placed an order for masks with Primex and transferred $2.269 million to Primex as part of that transaction. *See* (Dkt. #95-1 ¶¶ 3–7); (Dkt. #95-6); (Dkt. #95-11); (Dkt. #95-12). Importantly, the record reflects that Fritz started negotiations with Primex shortly after receiving CHU's deposit and issued a purchase order within the two-week delivery deadline. *See* (Dkt. #86-4 at 44–45); (Dkt. #95-6). Based on this evidence, there exists a genuine issue of material fact as to whether Fritz had "no intention" of delivering within the relevant timeframe when he made the alleged promise. A reasonable jury could conclude, for example, that Fritz lacked the requisite intent to deceive when he made the alleged promise, and that his failure to deliver was the result of mere gross negligence.[7]

---

[7] In late 2022, Fritz pleaded guilty to two counts of federal wire fraud, unrelated to the mask-purchase transaction at issue here. *See* (Dkt. #182, #183, #184). As part of that plea, Fritz admitted to knowingly and intentionally devising a scheme to defraud two individuals "by means of false and fraudulent" pretenses, representations, and promises. *See* (Dkt. #182 ¶ 3). Fritz also admitted to using DDGI in furtherance of that scheme. *See* (Dkt. #182 ¶¶ 5–7, 12). CHU submitted Fritz's factual basis as supplemental evidence of his fraudulent intent here. (Dkt. #180 at 2–3). Although Fritz's guilty plea is relevant and may be admissible to show intent, its probative value is necessarily limited because it concerns different transactions and different parties than those here. Accordingly, a genuine dispute remains as to whether Fritz acted with the requisite fraudulent intent, at the relevant time, in this particular transaction.

For these reasons, the Court **DENIES** summary judgment on CHU's fraud claim.

**G. Damages**

Having granted summary judgment in part, the Court now turns to damages. CHU asks that the Court award compensatory damages, exemplary damages, and interest. (Dkt. #86 at 35–37). CHU also requests leave to seek attorney's fees and costs. (Dkt. #86 at 37).

**i. Compensatory Damages**

CHU seeks $5.25 million, the amount of its unreturned deposit, in compensatory damages. It argues that the $5.25 million deposit is independently recoverable under its breach of contract, conversion, and theft claims. (Dkt. #86 at 35).

On its breach of contract claim, CHU is entitled to the full amount of the unreturned deposit—$5,250,000. The UCC provides that "[w]here the seller fails to make delivery . . . , the buyer may cancel and . . . recover[] so much of the price as has been paid." Tex. Bus. & Com. Code § 2.711(a). DDGI failed to deliver, so CHU is entitled to recover its entire deposit.

However, at the summary-judgment stage, CHU has only established entitlement to $2,980,425 on its conversion and theft claims. As explained above, there is a genuine dispute as to whether DDGI's $2,269,575 transfer to Primex constituted conversion or theft. *See supra* Part III.D.–E. So that amount must be deducted from the $5.25 million deposit, which is otherwise recoverable as

38

compensatory damages. *See Castaneda*, 1998 WL 34288695, at *3 ("[T]he correct measure of damages for conversion or wrongful detention of money is the amount of money detained or converted, plus interest."); TEX. CIV. PRAC. & REM. CODE § 134.005(a)(1) ("[A] person who has sustained damages resulting from theft may recover . . . the amount of actual damages found by the trier of fact[.]").

In sum, there is no genuine dispute that CHU is entitled to compensatory damages of $5,250,000 on its breach of contract claim; $2,980,425 on its conversion claim; and $2,980,425 on its theft claim. Because CHU's injury for each claim is the same—loss of its deposit—CHU may recover on only one claim and may be required to elect a remedy before final judgment. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("There can be but one recovery for one injury, and the fact that there may be more than one theory of liability does not modify this rule." (cleaned up)).

### ii. Exemplary Damages

In addition to compensatory damages, CHU seeks exemplary damages on its tort claims. (Dkt. #86 at 37). Under Texas law, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). While "exemplary damages should bear a reasonable proportion to actual damages sustained, the ratio will necessarily depend upon the circumstances of each individual case." *Lyon v. Wood*, 363 S.W.2d 179, 183 (Tex. App.—Dallas 1962, no writ). Texas

39

law identifies several factors for courts to consider in determining the amount of exemplary damages, including "the net worth of the defendant." TEX. CIV. PRAC. & REM. CODE § 41.011(a)(6). It also sets an upper limit on the amount of exemplary damages: the greater of (a) two times the amount of economic damages, plus noneconomic damages found by the jury up to $750,000; or (b) $200,000. TEX. CIV. PRAC. & REM. CODE § 41.008(b).

The Court cannot award exemplary damages at this stage because it has not finally resolved the claims for which exemplary damages are sought. There remain genuine issues of material fact as to both tort claims. And, importantly, compensatory damages for those claims, if any, have not been finally determined. Exemplary damages are predicated on compensatory damages, *see Phillips v. Latham*, 523 S.W.2d 19, 27 (Tex. App.—Dallas 1975, writ ref'd n.r.e.), so an award of exemplary damages here would be premature. The Court also notes that it currently lacks important evidence necessary to determine an amount of exemplary damages, such as "the net worth of the defendant." TEX. CIV. PRAC. & REM. CODE § 41.011(a)(6).

For these reasons, CHU's request for summary judgment as to exemplary damages is **DENIED**.

### iii. Interest

CHU also seeks pre- and post-judgment interest. (Dkt. #86 at 36). Because the Court has not finally determined liability or damages, CHU's request is premature. CHU's request is therefore **DENIED without prejudice**.

40

**iv. Costs and Fees**

Finally, CHU "requests leave to seek fees and costs should summary judgment be granted." (Dkt. #86 at 37). CHU's request is **DENIED without prejudice**. CHU may seek attorney's fees and costs under Federal Rule of Civil Procedure 54 following entry of judgment.

## IV. CONCLUSION

It is therefore **ORDERED** that Plaintiff CHU de Quebec–Universite Laval's Motion for Summary Judgment, (Dkt. #86), is **GRANTED in part** and **DENIED in part**.

The Court has **GRANTED** summary judgment that DDGI is directly liable to CHU for breach of contract and Fritz and DDGHI are jointly and severally liable to CHU for breach of contract. Defendants' liability encompasses the entirety of CHU's $5.25 million deposit with DDGI.

The Court has further **GRANTED** summary judgment that, as to CHU's $5.25 million deposit, minus the $2,269,575.00 sent to Primex on April 30, (Dkt. #86-11 at 2), DDGI is directly liable to CHU for conversion and Fritz and DDGHI are jointly and severally liable to CHU for conversion.

The Court has further **GRANTED** summary judgment that, as to CHU's $5.25 million deposit, minus the $2,269,575.00 sent to Primex on April 30, (Dkt. #86-11 at 2), DDGI is directly liable to CHU for theft under the TTLA and Fritz and DDGHI are jointly and severally liable to CHU for theft under the TTLA.

CHU's summary-judgment motion is otherwise **DENIED**.

41

42

It is further **ORDERED** that Plaintiff CHU de Quebec–Universite Laval's Motion for Leave to Submit Supplemental Authorities and Exhibits, (Dkt. #180), is **GRANTED**. Plaintiff's supplemental exhibits, (Dkt. #181, #182, #183, #184), are deemed properly filed.

**So ORDERED and SIGNED this 22nd day of April, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE